# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES | : |
| v. | : Case No. TDC-20-258 |
| TERVELL HAM, | : |
| Defendant | : |

## MOTION TO SUPPRESS ALL EVIDENCE DERIVED FROM WARRANTLESS BLOOD DRAW

Tervell Ham, by and through his attorneys, James Wyda, Federal Public Defender for the District of Maryland, and Stephanie Snyder and Andrew R. Szekely, Assistant Federal Public Defenders, hereby respectfully requests that this Honorable Court order the suppression of any and all evidence obtained as a result of the search and seizure of Mr. Ham which occurred when the police obtained a sample of his blood without a warrant. In support of this motion, Mr. Ham states the following:

## FACTUAL BACKGROUND

Mr. Ham is charged in a two-count indictment with one count of Involuntary Manslaughter, in violation of 18 U.S.C. §§ 7 and 1112(b), and one count of Reckless Driving, in violation of 36 C.F.R. § 4.2 assimilating Md. Code. Ann. Transp. Art. 21-901.1(a). *See* Indictment, ECF No. 1. The charges arise from a December 28, 2019, single-car accident on the Suitland Parkway. The government alleges that Mr. Ham was under the influence of phencyclidine (PCP) and as a result, that he was "incapable" of safely operating his car.

The accident occurred at approximately 5:30 p.m. When EMS and other emergency personnel responded, they found Mr. Ham trapped in the driver's seat of the car. Mr. Ham drifted in and out of consciousness as emergency responders worked to extract him from the vehicle—a

1

process that ultimately took close to 40 minutes. He was then helicoptered to MedStar Trauma Center in Washington, D.C.

Once at the hospital, Mr. Ham received medical services in the emergency room of the Trauma Center. In addition to a battery of diagnostic tests to determine the extent of his injuries, Mr. Ham was given an IV that included fentanyl, a powerful opioid, for his pain. *See* Exhibit A, ER Records Extract.[1]

Not long after Mr. Ham arrived at MedStar, United States Park Police Officer Bryan McDonald, Badge No. 0311, met with him in the emergency room. There, he began to ask Mr. Ham about the crash and the events leading up to it. *See* Exhibit B, Police Report of Officer McDonald. Mr. Ham was unable to provide any details about the accident but acknowledged that he took a number of medications to treat his various health issues. *Id.* Officer McDonald then, "explained to Ham the process in which we will be taking his blood." *Id.*

Officer McDonald had been dispatched to the hospital with instructions from United States Park Police Detective Monique Pettett to, "make contact with HAM regarding consent for the blood draw. Detective Pettett also requested that Ofc. McDonald request that medical staff draw blood from HAM for toxicology and the police would respond at a later date and time with a subpoena and/or search warrant for the blood from HAM." *See* Exhibit C, Excerpt from Detective Pettett's police report.

Officer McDonald reports that, as soon as he had explained the process by which the Park Police would obtain a sample of his blood, Mr. Ham, "gave consent immediately and signed documentation." *See* Exhibit B. This documentation included the 36 CFR Chemical Testing

---

[1] Counsel can provide a complete set of the hospital records should the Court wish to review them in advance of the hearing on this motion.

Notice used by the United States Park Police in DUI cases. *See* Exhibit D, 36 CFR Chemical Testing Notice. The form states in relevant part:

> There is probable cause to believe that you were operating or were in physical control of a motor vehicle while under the influence of alcohol and/or drugs to the degree that rendered you incapable of safe operation in violation of 36 CFR 4.23. This regulation requires you to submit to one or more tests at the direction of a law enforcement officer of your breath, urine, and/or saliva to determine the sample's alcohol and/or drug content. Refusal to provide one or more samples of breath, urine, and/or saliva for testing is **PROHIBITED**. Your consent is **NOT** required to obtain a sample and a sample **MAY BE** taken without your permission.
>
> If a sample cannot be obtained through the reasonable efforts of the police, you will be charged with refusal to submit to chemical testing, an offense that carries a maximum penalty of imprisonment for six months, a fine of $5000.00, or both, and a special assessment fee of $10.00 and a processing fee of $30.00. Furthermore, evidence of refusal may be admissible in any related judicial proceeding.
> …
> In the event that the police seek to test your <u>blood</u> to determine the sample's alcohol and/or drug content, the officer is generally obligated to seek a search warrant unless anticipated delays in obtaining a warrant justify a blood test without judicial authorization OR unless you voluntarily agree to submit a blood sample.

*Id* (emphasis in original).

While the box on the form indicating that, "I understand that the officer is seeking the testing of blood" is checked, the box indicating that the individual is consenting to a blood draw in the absence of a search warrant is left blank. *Id.* Mr. Ham signed this document at 7:00 p.m. *Id.* Five minutes later, Mr. Ham signed what is labeled a "consent form" that recites: "Let my signature state I have given consent for these blood samples to be taken." *See* Exhibit E, Consent Form Card.

After these documents were signed, it appears that various attempts were made to secure a blood sample from Mr. Ham as there are several different times noted in the paperwork accompanying his blood kit. *See* Exhibit F, Photos of Blood Kit. According to records completed by Officer McDonald, the blood sample was ultimately obtained at 8:03 p.m. *See* Exhibit B and Exhibit G, Blood Draw Paperwork. By the time that Mr. Ham's blood was being taken, United

States Park Police Detectives Pettett and Turner had arrived at the hospital and begun asking Mr. Ham about the events of the day and his medical history. *See* Exhibit H, Report of Detective Turner. The detectives noted that Mr. Ham "appeared coherent" and spoke in a "calm, clear manner", but also recounted that a doctor came to his bedside during their conversation and told Mr. Ham that his "blood sugar count was very low." *Id.* Mr. Ham was released from the hospital later that evening. No warrant authorizing a blood draw ever issued.

Mr. Ham's blood kit was subsequently transported to the District of Columbia Office of the Chief Medical Examiner where it was screened for the presence of alcohol and drugs. While there was no alcohol present in Mr. Ham's blood, several chemical metabolites and compounds were detected.

**ARGUMENT**

The United States Park Police obtained the sample of Mr. Ham's blood in violation of his right to be free from unlawful searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution. They had no probable cause for the search. They did not obtain a warrant. And, because Mr. Ham's putative consent to the blood draw was not voluntarily given, no valid exception to the warrant requirement applies. Consequently, this Court must suppress the fruits of that unlawful search and preclude the government from introducing or making derivative use of the toxicology report at trial.

I. **Applicable Legal Framework**

A. **Blood draws are searches that generally require a warrant**.

The Supreme Court has repeatedly and unequivocally held that a blood draw is a search implicating the protections of the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757 (1966). Given the invasive nature of this particular intrusion, and the multitude and variability of highly personal information contained within a person's blood—which could include details

ranging from a person's ancestry to their medical history, a warrant issued by a neutral and detached magistrate upon a finding of probable cause is generally required before the police can obtain a blood sample from an individual. *See, e.g., Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (explaining that this type of search is, "a compelled physical intrusion beneath McNeely's skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation. Such an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy . . . the importance of requiring authorization by a 'neutral and detached magistrate' before allowing a law enforcement officer to 'invade another's body in search of evidence of guilt is indisputable and great.'") (internal citations omitted).

In this case, despite the availability of a process by which a telephonic warrant could be obtained at any hour of the day or night from a United States Magistrate Judge, the police made no efforts to secure one. *See generally United States v. Jubor*, No. 19-po-63-TMD, 2019 WL 5064680 at *1-2 (D. Md. Oct. 9, 2019) (describing the process by which warrants authorizing blood draws in DUI cases are obtained in this district).

### B. There was no probable cause for the blood draw.

Because a warrantless search is presumptively unreasonable, the government bears the burden of demonstrating that a recognized exception to the warrant requirement applies if they wish to make use of the fruits of that search at trial. *United States v. Karo*, 468 U.S. 705, 717 (1984). Here, they cannot do so.

As a threshold matter, there was no probable cause upon which a warrant could have issued. While it is true that the police were investigating a serious traffic accident and that witnesses described Mr. Ham's vehicle as striking the curb repeatedly and traveling faster than the posted speed limit in the moments before the crash, that driving behavior alone does not establish the

requisite level of probable cause that evidence of a crime would be found inside of Mr. Ham's blood. *Cf. United States v. Blakeney*, 949 F.3d 851, 859-860 (4th Cir. 2020) (a blood draw warrant was supported by sufficient probable cause where there was: 1) "gross driver error" in a crash where the driver crossed the median and collided head-on into an oncoming vehicle; 2) a smell of alcohol coming from the car; and 3) the defendant was combative with first responders on the scene). Here, by contrast, there is only the fact of the accident itself, which standing alone does not general probable cause. *See Cuvo v. De Biasi*, 169 F. App'x 688, 690 (3d Cir. 2006) (probable cause requires "some evidence independent of the accident itself, such as bloodshot eyes, slurred speech, or the smell of alcohol on the suspect's breath"). Significantly, neither Officer McDonald who spent hours with Mr. Ham shortly after the crash, nor Detectives Pettett and Turner who also interviewed him in the hospital that evening, noted that Mr. Ham displayed any indicia of intoxication or impairment that night. *See* Exhibits B and H.

But even assuming *arguendo* that the government could establish probable cause for a search of Mr. Ham's blood, several other traditional exceptions to the warrant requirement would not apply. For example, Mr. Ham was not arrested that evening because there was no basis upon which the police could have done so. But even had he been, a blood draw (unlike a breath test) is not a permissible search incident to arrest in a DUI case. *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016). Nor were there exigent circumstances that would justify dispensing with a warrant application. The Supreme Court has previously held that the natural dissipation of alcohol from the blood does not create an exigency that would excuse the need for a warrant, *McNeely, supra*;

and there was nothing that took place in the hours after the crash—hours that Mr. Ham spent accompanied by a police officer at all times—that would otherwise create one.[2]

## C. Voluntary consent excuses the need for a warrant. But mere acquiescence to apparent governmental authority does not. False claims about the scope of the government's lawful authority also invalidate consent.

Because there was neither probable cause for the search at issue nor any other lawful justification for it, the only way the government can use the fruits of the warrantless search of Mr. Ham's blood is by convincing this court that Mr. Ham's purported consent to the procedure was voluntary and valid. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). It was not.

While a person's consent to a search does excuse the need for a warrant, the government must establish that their agreement was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). The court must consider the totality of the circumstances when determining whether, "a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 227; *see also United States v. Lattimore*; 87 F.3d 647, 650 (4th Cir. 1996) (noting that this inquiry incorporates both the characteristics of the accused and the conditions under which the consent was secured including the officer's conduct as well as the duration, time, and location of the encounter); *United States v. Castillo Palacio*, 427 F.Supp.3d 662 (D. Md. 2019).

The Supreme Court has long cautioned that a person's mere acquiescence to a show of authority is insufficient to create consent. *Bumper*, 391 U.S. 543 at 548-549 (holding that, "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of

---

[2] *See generally Jubor*, 2019 WL 5064680 at *5-6 (discussing the exigent circumstances doctrine in this context). Additionally, because Mr. Ham was conscious upon his arrival at the hospital, the categorical exception to the warrant requirement created by the Supreme Court in *Mitchell v. Wisconsin* also does not apply. *Mitchell v. Wisconsin*, 139 S. Ct. 2525 (2019) (holding that police can generally perform a warrantless blood draw on an unconscious driver suspected of a DUI).

7

proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than mere acquiescence to a claim of lawful authority."); *accord United States v. Robertson*, 736 F.3d 677 (4th Cir. 2013) (finding that a defendant who walked over to a police officer, turned around, and raised his arms in response to the officer asking him if he could search him, had not consented to the search but had instead acquiesced to a show of authority); *United States v. Lohmeyer*, No. 15-po-913-MLC, 2016 WL 4473458 (D. Wyo. July 1, 2016) (defendant's mere acquiescence to a blood draw did not constitute voluntary consent).

Moreover, while the government does not necessarily have to inform a person that they have the right *not* to agree to a search for consent to be valid, the lack of this sort of an advisement is a factor that must be considered. *Schneckloth*, 412 U.S. at 227; *Robertson*, 736 F.3d at 680 ("Whether the individual searched was informed of his right to decline the search is a 'highly relevant' factor.") (internal citations omitted).

And where, as here, a governmental agent makes false or incorrect representations about a person's obligations with regard to the search, any resulting "consent" must be viewed with disfavor. *See, e.g., Bumper v. North Carolina*, 391 U.S. 543, 549-550 (1968) (finding that consent given after an officer represented that he had a search warrant which the government neither relied upon nor produced was not voluntary); *United States v. Rush*, 808 F.3d 1007 (4th Cir. 2015) (officer's false claim to have a search warrant invalidated defendant's acquiescence to the search); *United States v. Saafir*, 754 F.3d 262 (4th Cir. 2014) (officer's false claim of probable cause to search a vehicle irreparably tainted the encounter and resulting search). *See also Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1233 (10th Cir. 2001) (noting that, "voluntary consent cannot be based on a misrepresentation of lawful authority."); *United States v. Vasquez*, 724 F.3d 15, 27

(1st Cir. 2013) (consent is invalid if, "secured as a result of either an unreasonable assessment of the facts or a misapprehension of the law.").

Courts have repeatedly made plain that these general principles apply with equal vitality to the types of searches typically attendant to DUI cases: when an officer incorrectly advises and/or misleads an individual about their obligation to submit to a search of their breath or blood, the "consent" that results means little. *See Birchfield* at 2186-2187 (vacating and remanding a judgment suspending petitioner Beylund's driver's license where he consented to a blood draw only after being incorrectly informed that refusing the test would result in a criminal charge); *United States v. Becenti*, No. 17-cr-344-MCA, 2017 U.S. Dist. LEXIS 61597 at *8 (D. N.M. April 24, 2017) (noting that, after *Birchfield*, "consent for a blood draw that is given in response to a threat of punishment, even under an implied consent law, is invalid because it is coerced."). And in an involuntary manslaughter case that is not dissimilar to Mr. Ham's case, a federal judge found that a defendant's explicit consent to a blood draw could not be deemed voluntary when the investigating agents erroneously believed that they had the lawful ability to obtain a blood sample and proceeded accordingly. *United States v. Hutchison*, No. 2:16-CR-168-DBH, 2018 WL 447619 (D. Me. Jan. 17, 2018) (a defendant's explicit consent to a blood draw was not voluntary where investigators erroneously believed that the law required that he submit to one and advised him accordingly). *See also United States v. Drew*, No. 18-po-6712-TMD, 2019 WL 2476672 at *5 (D. Md. June 13, 2019) (*appeal pending*) (holding that, "a government agent may not misrepresent the lawful consequences that the arrestee faces if he refuses to cooperate" [with a breath test], or the resulting search, even when conducted incident to arrest, would be unreasonable for Fourth Amendment purposes).

## II. Mr. Ham's Putative Consent was Involuntary Because He Merely Acquiesced to a Misleading Show of Authority.

When Officer McDonald, "explained to Ham the process in which we will be taking his blood",[3] Mr. Ham was in a Level One trauma center. He had just been in a devastating accident where he had to be cut out of the driver's seat of a car in which his friend and front seat passenger was also trapped and dying. He had been flown by helicopter to the hospital where he underwent a battery of testing and was clearly struggling to recall the events of the evening in response to police questioning. *See* Exhibits B and H. Doctors noted that his blood sugar was "very low" and had given him fentanyl to alleviate his pain. *See* Exhibits H and A. Under these circumstances, Mr. Ham had no ability to give meaningful and voluntary consent. *Compare with Mincey v. Azizona*, 437 U.S. 385, 398-99 (1978) (finding statements made while Mincey was in the ICU, unable to think clearly, and while he was on his back on a hospital bed "encumbered" by medical equipment were involuntary). Mr. Ham's putative consent to the blood draw was thus not the "product of rational intellect and a free will." *Id.* at 398 (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)). As such, this Court should find that the totality of the surrounding circumstances weigh against holding that Mr. Ham was in any condition to voluntarily relinquish his fundamental Constitutional rights and provide meaningful consent to the blood draw procedure.

But even if the Court finds that Mr. Ham had the capacity to consent to a search while receiving treatment at the hospital, Mr. Ham's vulnerability in that moment meant that at the very least the police should have been particularly scrupulous about making sure he understood exactly what they sought from him and the limits of what they could compel from him. But instead of asking Mr. Ham to consent to the blood draw procedure, Officer McDonald began their

---

[3] *See* Exhibit B

conversation by telling Mr. Ham that the police were going to obtain his blood. *See* Exhibit B. "The process in which *we will be taking* … blood" was thus presented to Mr. Ham as being a foregone conclusion. *Id.* (emphasis added). There is no meaningful difference between what transpired here and the situations described in *Bumper*, *Rush*, or *Saafir* where officers irreparably tainted colloquies that purportedly sought consent for a search by invoking their own apparent authority to search anyway.

Officer McDonald's framing of the issue in this manner is wholly unsurprising given that Detective Pettett had specifically instructed him to have hospital personnel draw Mr. Ham's blood regardless of whether he consented or not. *See* Exhibit C. Here, just as in *Hutchison*, the investigating agents believed that they were entitled to conduct a blood draw and acted and advised Mr. Ham accordingly. In reality, the police could not have obtained Mr. Ham's blood that night without his consent because they had no probable cause to believe that evidence of a crime would be contained therein and they would have been unable to secure a valid search warrant. Thus, that Mr. Ham, like Mr. Hutchinson, "gave consent immediately"[4] after hearing Officer McDonald describe "the process in which we will be taking his blood", is far from being dispositive because it, at best, represents "mere acquiescence to a claim of lawful authority." *Robertson*, 736 F.3d at 680 (quoting *Bumper v. North Carolina*, 391 U.S. 543 (1968)).

Only further compounding the misleading and coercive nature of the process by which Mr. Ham's putative consent was obtained, Officer McDonald presented Mr. Ham with a document informing him that there was probable cause to believe that he had been driving under the influence of alcohol or drugs (there was not), explaining that he was required to submit to one or more tests at the direction of a law enforcement officer of his breath, urine, and/or saliva (he was not), and

---

[4] *See* Exhibit B.

11

warning him that refusing to do so was a criminal offense (it would not be). *See* Exhibit D. While the form does note that blood draws generally require judicial authorization, that statement—coming after Mr. Ham had been told by a police officer that there was a "process in which we will be taking his blood" *and* after he had been erroneously informed that there was probable cause to charge him with a DUI and improperly advised that there would be criminal consequences for refusing tests of his breath, urine, or saliva—hardly dispels the taint of what preceded it.

Officer McDonald told Mr. Ham that the police had a process by which they were going to obtain his blood and then handed him a form reciting that there was probable cause to charge him with a crime even though there was, in fact, no such thing. That form contains a selectively bolded and highlighted warning that refusing to provide the police with, for example, a urine sample upon request is itself a crime. Under these circumstances, even if the Court finds that the hospitalized and medicated Mr. Ham had the theoretical capacity to consent, the actual "consent" the police obtained was neither informed nor voluntary. Rather, it was based on, and intertwined with, a cascade of incorrect information provided by the police. Mr. Ham did nothing more than merely acquiescence to the apparent authority of law enforcement. Because that is not sufficient to evince voluntary consent to a procedure that would have been otherwise disallowed by law, this Court must suppress the results of the blood draw.

## CONCLUSION

Wherefore, for the above reasons and for any other reasons which may appear to the court, Tervell Ham requests that all evidence, derived either directly or indirectly from this warrantless blood draw and which the government proposes to use as evidence against him, be suppressed.

Respectfully submitted,<br>
JAMES WYDA<br>
Federal Public Defender

for the District of Maryland

\_\_\_/s/_____
STEPHANIE SNYDER (#807063)
ANDREW SZEKELY (#16407)
Assistant Federal Public Defenders
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770-4510
(301) 344-0600
(301) 344-0019 (fax)
Email: stephanie_snyder@fd.org
andrew_szekely@fd.org

## **REQUEST FOR HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for the District of Maryland, a hearing is requested on the Defendant's motion.

_____/s/_____

Stephanie Snyder
Assistant Federal Defender